137 F.3d 1382
 1998-1 Trade Cases P 72,073, 98 Cal. Daily
Op. Serv. 1602,
98 Daily Journal D.A.R. 2255
INTERNATIONAL TECHNOLOGIES CONSULTANTS, INC., Plaintiff-Appellant,
v.
PILKINGTON PLC, Defendant,
Guardian Industries Corporation, Defendant-Appellee.
 No. 94-17143.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 16, 1996.
Decided March 6, 1998.
 
 Steven M. Edwards, Davis, Scott, Weber & Edwards, P.C., New York City, for plaintiff-appellant.
 Elliot S. Kaplan, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for defendant-appellee.
 Appeal from the United States District Court for the District of Arizona William D. Browning, District Judge, Presiding. D.C. No. CV-93-00552-WDB.
 Before: SNEED, PREGERSON and KLEINFELD, Circuit Judges.
 OPINION
 KLEINFELD, Circuit Judge:
 
 
 1
 International Technologies has been engaged for some time in attempts to participate in the plate glass industry, dominated by Pilkington and its licensees, including Guardian. An earlier pair of lawsuits between International Technologies and Guardian resulted in a consent decree. The issue before us is whether the consent decree barred this new lawsuit.
 
 FACTS
 
 2
 The district court granted judgment on the pleadings, so no evidence has been presented and no findings have been made. We do not know whether the facts set out below are true. They are a summary of what the unsuccessful plaintiff pleaded. The appellate task in reviewing dismissal under Federal Rule of Civil Procedure 12(c) is to determine whether, if the facts were as pleaded, they would entitle the plaintiff to a remedy. See Merchants Home Delivery Serv., Inc. v. Hall & Co., 50 F.3d 1486, 1488 (9th Cir.1995).
 
 
 3
 International Technologies Consultants ("ITC") has been trying for years to get into the engineering and consulting end of the plate glass business. It has been thwarted by Pilkington and its licensees. ITC claims that the means by which Pilkington and its licensees have thwarted its participation in the industry amount to antitrust violations under the Sherman Act, sections 1 and 2, and also constitute various common law torts.
 
 
 4
 Glass is made by melting sand, limestone, and other minerals such as dolomite. Until a few decades ago, good plate glass that would allow a clear view without bubbles or ripples was made by drawing glass from a furnace in strips, rolling it to the desired thickness, grinding it flat, and polishing it on both sides. The modern "float" technique is to pour the molten glass on a layer of very pure molten tin, so that the molten glass floats on the tin. The surface of the molten tin is very smooth. When the glass hardens it is about as smooth as the molten tin was and does not need grinding and polishing. This float process makes better plate glass for less money than the old way. Although the float process was first patented in 1905, it did not become commercially widespread until Alistair Pilkington developed a practical version, patented in the late 1950's and early 1960's.
 
 
 5
 By the beginning of 1992, Pilkington plc owned all but one of the manufacturing plants around the world employing the float process for making plate glass. Because the older method was commercially obsolete, this gave the Pilkington firm a monopoly. But the firm had two problems maintaining its monopoly, expiring patents and difficulty maintaining secrecy.
 
 
 6
 The critical patents expired in the late 1970's and early 1980's. Expiration of the patents did not by itself destroy Pilkington's ability to control the industry. While the patents had still been in effect, Pilkington had licensed their use, and required the licensees to keep the details of the float glass process secret. But the nature of plate glass makes it hard to keep a secret about how to make it. It cannot all be made in one plant by one manufacturer. Unlike, say, photographic film, glass is brittle and heavy, so shipping expense and breakage make it impractical to manufacture all the world's plate glass in one place. Instead, factories produce glass by the float process all over the world. Yet 95% of the commercial grade plate glass in the world is produced by Pilkington and its licensees.
 
 
 7
 Guardian started out as a challenger to Pilkington's dominance. It hired experts from the glass manufacturing division of Ford Motor Company, a Pilkington licensee, and went into the business of designing and operating float glass factories. After a flurry of lawsuits, Pilkington and Guardian settled their differences and made a secret agreement to prevent new entrants into the market. Guardian was to take the lead in order to enable Pilkington, a British company, to reduce its exposure to United States antitrust law.
 
 
 8
 Appellant ITC began effective marketing of float technology in the early 1980's. ITC does not actually manufacture glass; rather, it sells engineering and consulting services to glass manufacturers, to help them build float process manufacturing plants. Its engineers used the public domain information in Pilkington's expired patents, and their own knowledge, rather than Pilkington's manufacturing secrets, to design ITC's technology.
 
 
 9
 Pilkington successfully destroyed a number of ITC ventures. In 1984, ITC had Norwegian government and private support for a float glass plant there. Pilkington falsely told the Norwegian government that its proprietary rights prevented anyone from operating float glass manufacturing plants without a Pilkington license, told ITC's sources of financing that ITC had stolen the design, and threatened to sue them if they cooperated with ITC. ITC's major source of financing pulled out because of Pilkington's threats of lawsuits.
 
 
 10
 ITC then obtained government and private financing to build a plant in Donora, Pennsylvania. One of the subcontractors it hired to formulate bid specifications, Stewart Engineering, had done work for Pilkington, but not on the design of the tin bath component of the float technology. Pilkington had Guardian sue Stewart Engineering in state court in Michigan. The lawsuit was based on false allegations with no reasonable basis that Stewart had stolen the Pilkington-Guardian float process technology. This baseless litigation had the practical consequence, as intended, of driving away ITC's financing so that the project collapsed. Guardian then took no further action in the lawsuit, leaving it pending but unpursued.
 
 
 11
 In 1990, ITC bid on a huge project to build a plant in Indonesia, again using Stewart Engineering. Guardian told ITC's financing sources, the government of Indonesia and private sources, that it would sue for patent infringement if they proceeded with ITC. Though some suppliers backed out, the project was still proceeding. When it was more than half done, Guardian began filing papers in the Michigan lawsuit against Stewart Engineering. The lawsuit had been lying fallow for 18 months, yet Guardian moved for a temporary restraining order, returnable the same day as the motion. ITC was added as a defendant and slapped with the temporary restraining order, with no practical opportunity for it to defend itself. The Michigan state court order prevented ITC from building the tin bath in Indonesia using the Stewart Engineering design, so at this critical stage of construction, the Indonesia project was stopped. To get around the state court order, ITC brought an antitrust suit in federal court and tried to get a preliminary injunction and removal of the Michigan state court action. This strategy failed, and the federal antitrust suit was dismissed without prejudice.
 
 
 12
 About a month after the Indonesia project was shut down by the Michigan state court order, the Indonesian joint venturer began the termination process to fire ITC as co-venturer. The Indonesian company told ITC that it had to either defeat the trade secrets claim immediately, or else quickly redesign the tin bath to avoid the trade secrets issue. ITC's engineer, Robert Greenler, then redesigned the tin bath. His new design avoided the supposed trade secrets. After the Michigan state court judge strongly encouraged Guardian and ITC to settle, they reached an agreement in principle, and the court vacated the temporary restraining order against ITC.
 
 
 13
 The Michigan state court settlement is in the form of a confidential consent decree. It says it "will be held confidential except as required by law or as necessary to enforce the terms of this Consent Decree." The decree says that ITC would use the Greenler design for the plant in Indonesia, and Guardian would not assert any trade secret claims with respect to use of the Greenler design. The parties agreed that "[t]his Consent Decree and non-assertion shall not be used by any party in any manner in any future litigation among the parties." ITC covenanted not to sue Guardian on all claims "which arise out of the same facts" as the Michigan state court lawsuit, and all claims brought or arising out of the same facts as those in the federal antitrust suit that ITC had dismissed. ITC was permanently enjoined from using the Stewart design.
 
 
 14
 According to the complaint, the reason ITC agreed not to sue Guardian for claims arising out of the same facts or claims was economic coercion. Guardian and Pilkington had driven it to the edge of financial ruin by their relentless and illegal tactics, and ITC was about to be fired from the Indonesian project unless it settled the Michigan case.
 
 
 15
 When Dean Wiley, ITC's managing director, flew to Indonesia to tell the Indonesians that the Michigan case was settled and get the project going again, the Indonesian co-venturer wanted to see a copy of the consent decree. Even though the purpose of the consent decree was to enable ITC to resume the Indonesia project, Guardian refused to allow ITC to show it to the Indonesian company, insisting that the confidentiality provision applied. Because ITC could not show its Indonesian co-venturer the consent decree, the co-venturer fired ITC.
 
 
 16
 In 1989, ITC agreed to work with a European glass distributor on constructing a float glass plant in France. Work on what they called the "Euroglas" project began in 1991. One of Pilkington's licensees persuaded a bank to deny a loan on the basis that Pilkington was the exclusive worldwide licensor of float glass technology. Another bank was interested in lending, but the financing had to await government permits. Pilkington and Guardian worked with environmental groups so that they would oppose issuance of the permits. Guardian also claimed with no basis whatsoever that the tin bath design ITC proposed to use was a secret owned by Guardian, and threatened litigation. By making this threat, Guardian intentionally violated the consent decree, because it knew full well that ITC was using the permitted Greenler design and not the Stewart design. As a result of Guardian's aggressive and meritless attacks, the Euroglas project stalled.
 
 
 17
 ITC then went back to the Michigan state court and obtained an order clarifying the decree. The order provided that a mutually agreeable consultant would decide whether ITC's design was permitted or prohibited under the consent decree. The expert consultant reported that the ITC design was entirely unobjectionable. Thus ITC had been in the right all along, that it was not using Pilkington's trade secrets.
 
 
 18
 Numerous subsequent prospective customers of ITC were warned off by Pilkington and Guardian. Though meritless, the threats of litigation and claims of proprietary rights had the practical effect of causing a worldwide boycott of ITC. As a result, ITC was unable to complete a single float glass plant, and Pilkington and its licensees retained a worldwide monopoly on float glass technology. This monopoly rested on expired patents and fraudulent claims of trade secrets.
 
 
 19
 ITC sued Guardian and Pilkington in federal district court in Arizona, claiming that their conduct summarized above entitled ITC to antitrust and other remedies. The district court granted judgment on the pleadings in favor of Guardian, on the ground that the Michigan state court consent decree barred the action, as a matter of res judicata. ITC appeals. ITC's case against Pilkington was not the subject of a final judgment in district court, but there was a Rule 54(b) certification making the Guardian judgment final.
 
 ANALYSIS
 
 20
 ITC makes two arguments, that the covenant not to sue in the Michigan state court consent decree does not apply to its claims in the case at bar, and that the covenant is unenforceable.
 
 
 21
 A. Scope of the consent decree.
 
 
 22
 The res judicata effect of the Michigan consent decree is the central issue in this case. The Michigan state court case was settled, not litigated to a conclusion. A consent decree in a private action imposes no more on the party to be bound than that party agreed to. See United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757-58, 29 L.Ed.2d 256 (1971) ("[T]he instrument must be construed as it is written, and not as it might have been written had the [party seeking enforcement] established his factual claims and legal theories in litigation.").
 
 
 23
 In the Michigan case, ITC covenanted not to sue on designated claims, and its covenant was incorporated in the consent decree. The res judicata question is whether the claims ITC brought in the case at bar were covered by its covenant not to sue. The answer is plain--ITC promised not to sue again on claims which were brought in the Michigan state and federal cases, and those arising out of the same facts alleged in those cases. Here is the language delineating the scope of the covenant not to sue:
 
 
 24
 A. All claims which were brought, or which arise out of the same facts as those, in the Action.
 
 
 25
 B. All claims which were brought, or which arise out of the same facts as those, in the case Wiley and International Technologies Consultants, Inc. v. Guardian Industries Corp. and Pilkington P.L.C. Civil action 91-CV-40293-PL (U.S. District Court for the Eastern District of Michigan).
 
 
 26
 To determine whether ITC stated a claim as to which relief was barred by the consent decree, in light of this language delineating its scope, we compare the Michigan antitrust complaint that ITC filed in the Michigan federal case with the complaint filed in district court in the case at bar.[1]
 
 
 27
 The complaints in the case at bar and the Michigan antitrust case overlap. The Michigan complaint asserts the same general background regarding Pilkington's scheme to use licensing to maintain a world wide monopoly after its patents expired. The old and new complaints both allege that Pilkington and Guardian conspired to monopolize the plate glass market by sabotaging ITC's Donora, Pennsylvania, project and its Indonesia project. The words of the averments are different, but the claims arise out of the same facts.
 
 
 28
 The consent decree barred ITC from making claims brought or arising out of the same facts as those brought in the Michigan antitrust case. Thus, unless economic coercion relieves ITC from the consent decree, the district court properly dismissed ITC's claims based on the Donora project. Even if Guardian's conduct regarding the Donora project was an antitrust violation, ITC promised not to sue them again for it.
 
 
 29
 Indonesia is a little more complicated. ITC promised not to sue Guardian again for its conduct regarding Indonesia, insofar as any such claims "were brought, or ... arise out of the same facts" as those in the Michigan case. Yet ITC did just that. Unless economic coercion relieves ITC from the terms of the decree, the district court properly dismissed ITC's claims arising out of Guardian's alleged conduct that led up to the Michigan cases.
 
 
 30
 But ITC's complaint in the case at bar deals also with subsequent Indonesia conduct that was not and could not have been pleaded in the Michigan case. The averments are that after the consent decree, Guardian without any legitimate basis prevented ITC from showing the Indonesians the consent decree settling the Michigan case, and thereby caused the Indonesians to back out of the deal in fear of Guardian's trade secret and patent claims. Those claims were not "brought" and did not "arise out of the same facts as those" brought in the Michigan case. They could not have been brought, because the facts had not yet transpired when the Michigan case settled. As to these claims arising out of post-consent decree conduct, dismissal was not justified by the language of the consent decree.
 
 
 31
 The Euroglas project in France was not mentioned at all in the Michigan case. It could not have been, because it had not happened yet. The conduct alleged regarding the Euroglas project occurred after the decree was issued. ITC could not have and did not make any claim in the Michigan litigation, or allege any facts out of which a claim could arise, regarding the later Euroglas project. Thus the Euroglas claims were not barred by the consent decree.
 
 
 32
 The complaint in the case at bar alleges that Guardian and Pilkington sabotaged ITC's Euroglas project. Partly they used the old techniques of threatening baseless litigation based on false claims of patents and trade secrets, to scare the financing off. Additionally they used a new tactic: encouraging and working with environmental groups to clog the government permit process.
 
 
 33
 Two questions arise regarding the Euroglas project. The first is whether the new conduct, such as using environmental groups as cat's paws, and manipulating a director of a French bank, could be used as the basis of ITC's antitrust claims. These ITC claims cannot be characterized as arising out of the same facts as those in the Michigan cases. Accordingly, unless a subsequent amendment to the consent decree, discussed below, expands the decree to cover them, the antitrust claims arising out of these subsequent events are not barred.
 
 
 34
 The second question is whether conduct, to the extent that it is the same as Guardian and Pilkington used to sabotage the Pennsylvania and Indonesia projects, can be the basis of a claim regarding the Euroglas project. On this issue, Guardian argues that the claims are barred under the new damage from previously adjudicated conduct rule in Go-Video, Inc. v. Matsushita Elec. Indus. Co. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.), 11 F.3d 1460 (9th Cir.1993). ITC contends that there is no bar under the new conduct rule in Harkins Amusement Enters., Inc. v. Harry Nace Co., 890 F.2d 181 (9th Cir.1989). ITC is correct.
 
 
 35
 In Harkins, we held that where the "complaint alleges new antitrust conduct subsequent to" the last date alleged in the prior adjudication, the subsequent claim is not barred by res judicata or collateral estoppel. Id. at 183. "It is elementary that new antitrust violations may be alleged after the date covered by decision or settlement of antitrust claims covering an earlier period." Id. at 183. We quoted the leading antitrust scholar, Professor Areeda, for the proposition that " '[i]t cannot be emphasized too strongly that the continuation of conduct under attack in a prior antitrust suit is generally held to give rise to a new cause of action.' " Id. at 183 (quoting 2 Philip Areeda and Donald F. Turner, Antitrust Law § 323c (1978)). By winning the first action, the defendants "did not acquire immunity in perpetuity from the antitrust laws." Harkins, 890 F.2d at 183.
 
 
 36
 We noted an exception in Harkins, where a prior litigation defeat would bar the plaintiff. Where particular conduct was charged in the first case, and the same conduct was alleged to have caused subsequent damages in the second case, the determination in the first case might bar the plaintiff from asserting that particular claim in the second case. Id. at 183.
 
 
 37
 Dual-Deck Video fell within the Harkins exception. The plaintiff alleged damages from subsequent consequences of the earlier conduct, and that conduct had already been held not to violate the antitrust laws. See Dual-Deck Video, 11 F.3d at 1464. We distinguished Harkins, and followed a Fifth Circuit case, Exhibitors Poster Exchange Inc., v. National Screen Service, Corp., 517 F.2d 110 (5th Cir.1975). See Dual-Deck Video, 11 F.3d at 1463. The complaint alleged "only subsequent market consequences of the old conspiracy," and "continuation of commercial activity pursuant to the old arrangements held not to be an antitrust conspiracy." See id. at 1463-64. "Nothing new [wa]s alleged--no new conspiracy, no new kinds of monopolization, no new acts. Distinct conduct [wa]s alleged only in the limited sense that every day is a new day, so doing the same thing today as yesterday is distinct from what was done yesterday." Id. at 1464. Collateral estoppel applied because the earlier lawsuit "already answered the question" of whether the conduct amounted to an antitrust conspiracy. Id.
 
 
 38
 The case at bar is, as to the post-Michigan events, like Harkins, not Dual Deck Video. The consent decree did not say that ITC could not sue if Pilkington and Guardian did in the future what they had done in the past. Nor was there any adjudication that conduct such as Pilkington and Guardian had allegedly engaged in the past did not violate the antitrust laws. The consent decree said no more and no less than that ITC would not sue Guardian for claims brought or arising out of the same facts as those in state and federal Michigan actions. It presented no bar to suing Guardian for claims which were not brought in the Michigan actions and not arising out of the same facts, such as the French Euroglas project.
 
 
 39
 As to the Indonesia project, the complaint in the case at bar alleges both old claims and new. The new claim arising out of post-decree conduct is that by forbidding ITC from showing the Indonesians the consent decree, which would have proven ITC's right to use the Greenler design, Guardian committed an additional antitrust violation.
 
 
 40
 Appellee argues that because the consent decree was subsequently amended, it does apply to the subsequent conduct. A 1992 amendment made two substantive changes. One is to the confidentiality provision. The old confidentiality provision said that the consent decree would be held confidential except as required by law or as necessary to enforce it:
 
 
 41
 3. This Consent Decree will be held confidential except as required by law or as necessary to enforce the terms of this Consent Decree. All parties agree that this confidentiality provision is not a bar to enforcement of all or any part of this Consent Decree.
 
 
 42
 Because the consent decree obligated Guardian not to assert any trade secret claims with respect to use of the Greenler design in Indonesia, arguably enforcement of the consent decree entitled ITC to show it to the Indonesians when Guardian did subsequently assert trade secret claims with respect to use of the Greenler design in Indonesia. Showing it to the Indonesians might be a self-help means of enforcement.
 
 
 43
 The 1992 revision also changed paragraph 3, though the substantive difference is not entirely clear. This sentence was added:
 
 
 44
 Guardian shall not bring to the attention of third parties the existence of this Consent Decree unless it has reason to believe that the Consent Decree is being violated or in a reasonable response to an inquiry by a third party.
 
 
 45
 The previous sentences of paragraph 3 were not deleted.
 
 
 46
 There is nothing in the 1992 amendment that expands the covenant not to sue. Guardian's conduct in preventing the Indonesians from finding out about the consent decree, which occurred after the earlier decree was entered, is not sheltered by the amendment. ITC's theory is that the whole purpose of the consent decree, that is, of why it caved in on its claims, was so that it could proceed with the Indonesia project. Then, violating the implied covenant of good faith and fair dealing, and in furtherance of the Pilkington-Guardian worldwide monopoly on float glass technology, Guardian prevented ITC from using the consent decree to show the Indonesians that the trade secret dispute was over. That is a new claim and the amendment to the consent decree does not bar it.
 
 
 47
 The order amending the consent decree also adds a new provision referring to the French project. In the original consent decree, the parties agreed that ITC would designate a consultant acceptable to Guardian to inspect the tin bath being built in Indonesia. To verify that ITC was using the permitted Greenler-Stewart design, not the prohibited Guardian design, ITC agreed to let Guardian inspect future float glass projects for five years.
 
 
 48
 Although the parties here agreed to a procedure which might settle their differences and enable ITC's participation in the Euroglas project to move ahead, that appears to be all they agreed upon. There is no language in the amendment changing the covenant not to sue. There are no words purporting to expand the covenant not to sue to apply to the French project. Nor does logic compel the conclusion that, by agreeing to a procedure for a consultant, ITC by implication waived its antitrust claims. It would be logical for ITC to say "we don't think you have any right to prevent us from using the patented design, now that the patents have expired, and we don't think there are any trade secrets associated with it, but in fact we're not using it and we're willing to let you look and see that we're not using it." There was no contested adjudication, so there is nothing on which to base our decision except the language to which the parties agreed. Guardian did not obtain language which expressly or by implication amounted to a waiver or release of whatever antitrust claims ITC might have relating to the French project. The parties agreed that "[t]he conclusions of the inspection do not constitute an adjudication or determination that is legally binding on either party." Thus, ITC's antitrust claims relating to the Euroglas project are not barred.
 
 
 49
 B. Duress.
 
 
 50
 As we have explained above, the consent decree binds ITC not to sue Guardian on claims brought in the two Michigan actions, or arising out of the same facts. ITC has covenanted not to sue Guardian for its conduct affecting the Donora project and the Indonesia project (except for preventing ITC from showing the consent decree to the Indonesians).
 
 
 51
 ITC argues that as to those claims covered by the consent decree, it should nevertheless be allowed to sue, because its covenant not to sue was obtained by duress. Its pleadings allege that improper threats by Guardian of baseless litigation left ITC no reasonable alternative except to agree to the consent decree.
 
 
 52
 It is well established as a matter of antitrust law that the use of baseless litigation to drive out competition can amount to an antitrust violation. See, e.g., A & E Plastik Pak Co. v. Monsanto Co., 396 F.2d 710, 715 (9th Cir.1968); CVD, Inc. v. Raytheon Co., 769 F.2d 842 (1st Cir.1985) (bad faith assertion of trade secrets claim for purpose of restraining competition can be a violation of antitrust laws). ITC has pleaded that Guardian used baseless litigation and threats of baseless litigation to maintain its 95% world monopoly, including an improperly obtained temporary restraining order that shut down its Indonesia project. Because the Michigan decree was a consent decree in a private action based entirely upon the agreement of ITC and not on any judgment in adversarial proceedings, it can have no effect beyond that to which ITC validly agreed. See United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757-58, 29 L.Ed.2d 256 (1971).
 
 
 53
 The conduct alleged in ITC's complaint falls within the traditional definition of duress which makes a contract voidable:
 
 
 54
 Section 175 When duress by threat makes a contract voidable
 
 
 55
 (1) If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.
 
 
 56
 Restatement (Second) of Contracts § 175 (1981).
 
 
 57
 The threat must be improper. ITC's pleadings aver impropriety; ITC alleges that Guardian threatened a lawsuit and obtained a temporary restraining order by claiming that ITC was stealing its intellectual property, even though Guardian knew full well that the patents had expired, and that ITC had used knowledge in the public domain. Duress also requires that the victim have no reasonable alternative to succumbing to the duress, such as defending against an improperly brought lawsuit. ITC sufficiently pleaded absence of a reasonable alternative, for two reasons. The threats made to lenders and employers of ITC could and did, according to the pleadings, kill the projects, and there was no way ITC could do anything about them. As for the actual litigation, the obtaining of a temporary restraining order was pleaded as "use of oppressive tactics," because ITC had no fair opportunity to contest it, it was obtained despite Guardian's knowledge that it was meritless, and it had the practical effect of giving Guardian the victory, ending ITC's participation in the Indonesia project, regardless of whether ITC ultimately won the lawsuit. The duress pleaded is analogous to Illustration 2 in the Restatement:
 
 
 58
 2. A makes an improper threat to commence a civil action and to file a lis pendens against a tract of land owned by B, unless B agrees to discharge a claim that B has against A. Because B is about to make a contract with C for the sale of the land and C refuses to make the contract if the levy is made, B agrees to discharge the claim. B has no reasonable alternative, A's threat is duress, and the contract is voidable by B.
 
 
 59
 Guardian argues that Michigan defines duress more narrowly, citing Apfelblat v. National Bank Wyandotte-Taylor, 158 Mich.App. 258, 404 N.W.2d 725 (1987) and Enzymes of Am., Inc. v. Deloitte, Haskins & Sells, 207 Mich.App. 28, 523 N.W.2d 810 (1994), rev'd on other grounds sub nom. Porta-John Corp. v. DeLoitte, Haskins & Sells, 450 Mich. 889, 539 N.W.2d 513 (1995). These cases establish a rule that a party claiming duress must show that it was illegally compelled or coerced to act by fear of serious injury to its person, reputation, or fortune. See Enzymes, 523 N.W.2d at 814; Apfelblat, 404 N.W.2d at 728.[2] ITC alleges that Guardian violated the antitrust laws by maintaining sham litigation which left ITC with no alternative but to agree to the consent decree. Thus, Guardian's conduct fits even within the narrow Michigan definition of duress.
 
 
 60
 Guardian argues that duress cannot void the agreement, because ITC waited too long to challenge the consent decree on this ground, and ratified its covenant not to sue by subsequent conduct. The pleadings aver duress on June 21, 1991, when Guardian moved for a temporary restraining order in the Michigan case. ITC first claimed duress in the case at bar, filed December 6, 1993, two and a half years later. As for ratification, Guardian argues that ITC took the benefits of the consent decree, so it cannot now disaffirm its burdens.
 
 
 61
 There is no merit to Guardian's argument that ITC ratified the consent decree by taking its benefits. The benefit ITC sought by agreeing to the consent decree was elimination of the barrier to the Indonesia project. But according to its pleading, Guardian improperly deprived ITC of this benefit by preventing ITC from showing the consent decree to the Indonesians.
 
 
 62
 Guardian's delay argument is more substantial. According to ITC's pleading, Guardian drove it out of the Indonesia project in August of 1991.[3] Yet ITC did not claim voidability for duress until it filed this lawsuit in December of 1993, two and a half years later. Indeed, after the Indonesia project had been killed, ITC consented to the inspection procedure amendment to the consent decree, relating to the Euroglas project in France, without claiming duress. The duress that allegedly forced ITC to agree to the consent decree ended once it had lost the Indonesia project, in August of 1991.
 
 
 63
 Once the duress that forced a party to agree to a contract has ceased to exist, the victim of duress must tell the other party that it regards the contract as void, or else lose the voidability created by the duress:
 
 
 64
 Section 381. Loss of power of avoidance by delay.
 
 
 65
 (1) The power of a party to avoid a contract for ... duress ... is lost if, after the circumstances that made it voidable have ceased to exist, he does not within a reasonable time manifest to the other party his intention to avoid it.
 
 
 66
 Restatement (Second) of Contracts § 381(1) (1981). ITC lost the power to avoid the consent decree for duress by not manifesting its intention to avoid it within a reasonable time after its participation in the Indonesia project was dead. We therefore conclude that the district court correctly determined that ITC pleaded itself out of a duress defense to the consent decree.
 
 CONCLUSION
 
 67
 The founding fathers recognized a critical difference between intellectual and other forms of property, by specifying in the Constitution that patents can be granted only "for limited times":
 
 
 68
 The Congress shall have Power to ...
 
 
 69
 promote the Progress of Science and useful Arts by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;
 
 
 70
 U.S. Const. art. I § 8.
 
 
 71
 The owner of the patent is given a limited monopoly. The justification is that the public is best served by giving inventors monopolies on commercial exploitation of their innovations for enough time to furnish an incentive to do the work and spend the money creating them. The monopoly is conditioned on public disclosure of the details of their inventions, so that others can use or improve upon them after the "limited Times" for which the Constitution allows patents.
 
 
 72
 The stated objective of the Constitution in granting the power to Congress to legislate in the area of intellectual property is to "promote the Progress of Science and useful Arts." The patent laws promote this progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development. The productive effort thereby fostered will have a positive effect on society through the introduction of new products and processes of manufacture into the economy, and the emanations by way of increased employment and better lives for our citizens. In return for the right of exclusion--this "reward for inventions"--the patent laws impose upon the inventor a requirement of disclosure. To ensure adequate and full disclosure so that upon the expiration of the 17-year period "the knowledge of the invention enures to the people, who are thus enabled without restriction to practice it and profit by its use," the patent laws require that the patent application shall include a full and clear description of the invention and "of the manner and process of making and using it" so that any person skilled in the art may make and use the invention.
 
 
 73
 Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 480-81, 94 S.Ct. 1879, 1885-86, 40 L.Ed.2d 315 (1974) (internal citations and footnote omitted).
 
 
 74
 Alistair Pilkington invented an ingenious new method of making high quality flat glass at high speed, much less expensively than by grinding and polishing it, in the 1950's. He thereby made a great contribution to cheap, good plate glass for everyone. There was no way to exploit his invention while keeping it a close secret, as with the formula for Coca-Cola, because the weight and fragility of glass required that the method be used in factories around the world. The patent enabled the Pilkington company to take exclusive benefit of the idea for a limited period of time, even though numerous other people necessarily knew the method almost immediately. But intellectual property, unlike, say, real estate, can be owned pursuant to a patent only for a limited time.
 
 
 75
 Thomas Jefferson explained why the concept of theft does not apply to useful inventions, after their patent protection expires:
 
 
 76
 It has been pretended by some, (and in England especially,) that inventors have a natural and exclusive right to their inventions, and not merely for their own lives, but inheritable to their heirs.... Stable ownership is the gift of social law, and is given late in the progress of society. It would be curious then, if an idea, the fugitive fermentation of an individual brain, could, a natural right be claimed in exclusive and stable property. If nature has made any one thing less susceptible than all others of exclusive property, it is the action of the thinking power called an idea, which an individual may exclusively possess as long as he keeps it to himself; but the moment it is divulged, it forces itself into the possession of everyone, and the receiver cannot dispossess himself of it. Its peculiar character, too, is that no one possess the less, because every other possess the whole of it. He who receives an idea from me, receives instruction himself without lessening mine; as he who lights his taper at mine, receives light without darkening me. That ideas should freely spread from one to another over the globe, for the moral and mutual instruction of man, and the improvement of his condition, seems to have been peculiarly and benevolently designed by nature, when she made them, like fire, expansible over all space, without lessening their density in any point, and like the air in which we breath, move, and have our physical being, incapable of confinement or exclusive appropriation. Inventions then cannot, in nature, be a subject of property. Society may give an exclusive right to the profits arising from them, as an encouragement to men to pursue ideas which may pursue utility, but this may or may not be done, according to the will and convenience of society, without claim or complaint from anybody....
 
 
 77
 Thomas Jefferson, letter to Isaac McPherson, August 13, 1813, in Adrian Koch and William Peden, eds., The Life and Selected Writings of Thomas Jefferson 629-30 (1944).
 
 
 78
 We do not know whether Guardian and Pilkington have conspired to prevent others from using the ideas in Pilkington's expired patents, in violation of the antitrust laws, by means of unjustified litigation and threats of litigation. But if they have, as the complaint alleges, then the world is being deprived of the economic value of Alistair Pilkington's great invention. Indeed, in poorer areas of the world, doubtless people lack windows to let in the sun and keep out the rain, wind, cold, and insects, because of improper exploitation of monopoly pricing. Though ITC has given away its right to sue Pilkington and Guardian for some of its claims, it has not for others. The claims are at the heart of what is socially valuable in antitrust law. A good way to find out if they are true is to put the parties to their proof, and if there is a genuine issue of fact, to require them to try the case. Indeed that is the only lawful way to test the truth of the averments.
 
 
 79
 Accordingly, we affirm in part and reverse in part. ITC is bound by the consent decree, and barred by its covenant not to sue from asserting the claims brought or arising out of the same facts as those brought in the Michigan state court and federal cases. It is not barred from asserting the claims not so brought and not arising out of the same facts. Costs are awarded in favor of ITC against Guardian.
 
 
 
 [1]
 We have in the excerpts of record Guardian's complaint against ITC filed in Michigan state court, and ITC's complaint against Guardian filed in Michigan federal court. We apparently do not have in the excerpts ITC's answer and counterclaims filed in Michigan state court. We have obtained the complete record and have been unable to find it there either. It is conceivable that it is in one place or the other, but the combination of poor indexing, lack of sequential page numbers, and discontinuous tab numbers in the excerpts, and excessive sealing of most items in the clerk's record, makes it a practical impossibility to assure that anything is, or is not, in the record. We therefore take ITC's allegations in the Michigan cases from the complaint it filed in Michigan federal court, without regard to what may or may not be in whatever answer and counterclaim might have been filed in the Michigan state court case
 
 
 [2]
 A federal district court has predicted that the Michigan Supreme Court would abandon the element of illegality, and rule that duress need not arise from an illegal act. See Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp., 749 F.Supp. 794, 797 n. 5 (E.D.Mich.1990). We need not decide whether that court was correct, because ITC has alleged conduct on the part of Guardian that was both "improper," under the Restatement rule, and "illegal," per the Michigan cases
 
 
 [3]
 The dates are somewhat confusing. The Michigan state court decree in the record does not show the filestamp, but ITC's pleading avers that it was entered August 13, 1991, and that is consistent with the rest of the record. The pleading is inconsistent regarding the date ITC was driven out of the Indonesia project. Paragraph 49 says Mulia sent a letter July 26, 1993 firing ITC effective August 26, 1993. But paragraphs 42 through 48 describes ITC's firing by Mulia was part of a crisis that happened fast, in the summer of 1991. Paragraphs 50 through 54 describe events subsequent to Mulia's letter, leading up to the covenant not to sue in August 1991. These paragraphs aver that ITC's managing director flew to Indonesia to get its firing rescinded immediately after the consent decree was entered August 13, 1991, but on August 15 Guardian prevented ITC from showing the consent decree to the Indonesians, so ITC was terminated with finality. The context shows that the 1993 date in paragraph 49 was a typographical error